**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WHITING PETROLEUM CORPORATION, *et al.*,[1] | ) | Case No. 20-32021 (DRJ) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | (Emergency Hearing Requested) |
| | ) | |

# DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON APRIL 1, 2020, AT 1:30 P.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN APRIL 2, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1 (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Whiting Canadian Holding Company Unlimited Liability Corporation (3662); Whiting Petroleum Corporation (8515); Whiting US Holding Company (2900); Whiting Oil and Gas Corporation (8829); and Whiting Resources Corporation (1218). The location of the debtors' service address is: 1700 Lincoln Street, Suite 4700, Denver, Colorado 80203.

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING". THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state the following in support of this motion:

## Relief Requested

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto (respectively, the "Interim Order" and "Final Order"): (a) authorizing the Debtors to pay prepetition wages, salaries, other compensation, and reimbursable expenses and continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (collectively, the "Employee Obligations"); and (b) granting related relief. In addition, the Debtors request that the Court (as defined below) schedule a final hearing within 25 days of the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this motion on a final basis.

### I. The Interim Order.

2. To minimize disruption to the Debtors' businesses, the Debtors request the authority to make payments related to the Employee Obligations that become payable during the period between the Petition Date and entry of the Final Order (the "Interim Period") and to continue to honor the Employee Obligations in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures; *provided* that no individual holder of a priority claim under section 507(a)(4) of the Bankruptcy Code will

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of Whiting Petroleum Corporation, in Support of Chapter 11 Petitions and First Day Motions* and the *Declaration of Correne S. Loeffler, Chief Financial Officer of Whiting Petroleum Corporation, in Support of the Debtors' First Day Motions* (the "First Day Declarations"), each of which are to be filed in connection herewith.

receive in the aggregate a payment in excess of $13,650 on account of such claim. Estimates of these payments are below.

3. To enable the Debtors to carry out the relief requested, the Debtors request that the Court: (a) authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic fund transfer requests made by the Debtors related to the Employee Obligations, whether such checks were presented or electronic fund transfer requests were submitted before or after the date hereof; and (b) modify the automatic stay to the extent necessary to permit the relief requested in this motion with respect to the Debtors' Workers' Compensation Program (as defined herein).

## II. The Final Order.

4. In addition, at the hearing to approve the Final Order, the Debtors will seek entry of the Final Order, authorizing the Debtors to continue to honor the Employee Obligations in the ordinary course of business and in a manner consistent with the Debtors' prepetition policies, and to honor, pay, satisfy, or remit in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, all prepetition amounts outstanding on account of the following Employee Obligations, including amounts owed to individual holders of claims with respect to such Employee Obligations in excess of the wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. The Debtors' estimates as of the Petition Date of the Employee Obligations are set forth below.

| **Relief Sought** | **Estimated Interim Amount** | **Estimated Final Amount** |
|---|---|---|
| Unpaid Wages | $2,001,500 | $2,001,500 |
| Unpaid Contractor Obligations | $1,600,000 | $1,600,000 |
| Unpaid Withholding Obligations | $1,400,000 | $1,400,000 |
| Unpaid Expense Reimbursements | $20,000 | $25,000 |
| Non-Employee Director Compensation | $0 | $0 |
| Non-Insider Severance Program | $0 | $0 |

| | | |
|---|---|---|
| **Employee Benefit Programs** | | |
| Health Insurance Programs | $215,000 | $215,000 |
| Life and AD&D Insurance | $27,000 | $27,000 |
| Disability Benefits | $14,500 | $14,500 |
| Workers' Compensation Programs | $550,000 | $550,000 |
| 401(k) Plan | $150,000 | $150,000 |
| Paid Leave | $0 | $11,800,000 |
| **Supplemental Employee Benefits (Final Order Only)** | | |
| Wellness Reimbursement | $0 | $75,000 |
| Parking Program | $0 | $0 |
| Ecopass Program | $0 | $0 |
| Clean Air Stipend | $2,850 | $2,850 |
| Financial Counseling Program | $0 | $0 |
| **TOTAL** | **$5,980,850** | **$17,950,850** |

## Jurisdiction and Venue

5. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The bases for the relief requested herein are sections 105(a), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

8. Whiting Petroleum Corporation ("WLL") and its Debtor affiliates are an independent exploration and production company with an oil focused asset base. The Debtors' primary production and development activities are located in North Dakota and the Rocky Mountain region, with additional oil and gas properties located in Texas. The Debtors' assets predominately are mature properties with stable, high-quality, oil-weighted production. Headquartered in Denver, Colorado, the Debtors have approximately 500 employees. The Debtors' operating revenue for the twelve-month period that ended December 31, 2019 was approximately $1.6 billion, and, as of the Petition Date, the Debtors have approximately $3.4 billion in total funded debt obligations.

9. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce

10. The Debtors' employees, temporary workers, and independent contractors perform a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' employees, temporary workers, and independent contractors include highly-trained personnel who are not easily replaced. Without the

continued, uninterrupted services of their employees, temporary workers, and independent contractors, the Debtors' reorganization efforts likely will be jeopardized.

11. Moreover, the vast majority of the Debtors' employees exclusively rely on their compensation and benefits to pay their daily living expenses and support their families. Thus, the Debtors' employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing benefits. Consequently, the relief requested herein is necessary and appropriate.

12. The Debtors employ approximately 500 individuals (collectively, the "Employees"). Approximately 200 Employees are paid on an hourly basis and approximately 300 Employees receive a salary. No Employee is represented by a union or collective bargaining unit.

13. In addition to the Employees, the Debtors also retain from time to time specialized individuals as independent contractors (the "Independent Contractors"), either directly or from certain staffing agencies (collectively, the "Staffing Agencies"), to complete discrete projects. The Debtors currently retain approximately 80 Independent Contractors in the aggregate, although this number fluctuates based on the Debtors' specific needs at any given time. As described in greater detail herein, the Independent Contractors are a critical supplement to the efforts of the Debtors' Employees.

**Employee Compensation and Benefits**

14. To minimize the personal financial burden Employees and Independent Contractors would suffer if prepetition obligations are not paid or remitted to such parties when due or as expected, the Debtors seek authority to pay and honor certain prepetition claims and continue to honor obligations on a postpetition basis, as applicable, relating to, among other things, wages, salaries, health and welfare benefits, and certain supplemental benefits the Debtors historically

have provided (collectively, the "Employee Compensation and Benefits") on an interim and final basis, as detailed herein.

15. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business on a postpetition basis. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

## I. Compensation and Withholding Obligations.

### A. Wages.

16. The Debtors pay Employees' wages, salaries, and other compensation on a bi-weekly basis (collectively, the "Wages"). The Debtors pay Employees' Wages on either a salaried or hourly basis. The Debtors pay approximately $2.5 million on account of Wages in the aggregate on a bi-weekly basis.

17. Because the Employees are paid in arrears, Employees will be owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date due to, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees. As of the Petition Date, the Debtors believe that there are approximately $2.0 million in accrued but unpaid Wages (excluding Expense Reimbursements, Paid Leave, and amounts related to the 401(k) Plan (each as defined herein)) (collectively, the "Unpaid Wages") outstanding, substantially all of which will come due and owing in the Interim Period. Accordingly, the Debtors seek authority to pay their Employees any Unpaid Wages in the ordinary course of business and consistent with past practice, and to continue paying Wages to

their Employees in the ordinary course of business on a postpetition basis and consistent with past practice.

**B. Contractor Obligations.**

18. As discussed, the Debtors rely on Independent Contractors in the ordinary course of their business to perform a wide range of services critical to the Debtors' operations, including, among other things, providing drilling, engineering, and other operational services, information technology services, and various other administrative functions. The Debtors rely on the support of Independent Contractors to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Independent Contractors and the Staffing Agencies is critical to minimizing disruption of the Debtors' continued business operations. On average, the Debtors spend approximately $1.6 million on Independent Contractors on a monthly basis.

19. As of the Petition Date, the Debtors estimate they owe approximately $1.6 million to the Independent Contractors on account of services rendered prior to the Petition Date (the "Unpaid Contractor Obligations"), all of which will become due and owing within the Interim Period. The Debtors seek authority to pay any Unpaid Contractor Obligations, and to continue paying all amounts owed to the Independent Contractors in the ordinary course of business on a postpetition basis and consistent with past practice.

**C. Withholding Obligations.**

20. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks for, among other things, garnishments, child support, and other pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Certain of the Deductions are forwarded to various

third-party recipients. The Debtors deduct approximately $300,000 in the aggregate from Employees' paychecks on account of the Deductions on a bi-weekly basis.

21. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed. The Debtors remit approximately $900,000 in the aggregate on account of the Payroll Taxes on a bi-weekly basis.

22. As of the Petition Date, the Debtors estimate that there are approximately $1.2 million in accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations"), all of which will become payable in the Interim Period.

**D. Reimbursable Expenses.**[3]

23. In the ordinary course of business, the Debtors reimburse Employees for certain reasonable and customary expenses that such Employees personally incur in the scope of their

[3] In addition, the Debtors hold certain corporate credit cards that are used to pay for the Debtors' everyday ordinary course business expenses (the "Credit Card Program"). The Debtors remit amounts owed through use of the credit cards to certain financial institutions on a monthly basis. In accordance with the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* filed contemporaneously herewith, the Debtors seek authority to continue to honor the costs incurred through the Credit Card Program in the ordinary course of business on a postpetition basis and consistent with past practice. As a result, the Debtors are not seeking any additional relief with respect to the Credit Card Program pursuant to this motion.

employment (collectively, the "Expense Reimbursements"). Expense Reimbursements typically include expenses associated with travel, lodging, ground transportation, safety gear needed for work, and other business-related expenses necessary for the discharge of an Employee's duties. The Expense Reimbursements are incurred by Employees through the use of personal funds, and the applicable Employees may be held personally liable for any unpaid obligations despite the obligations having been incurred for the Debtors' benefit. Thus, the Debtors' inability to reimburse the Expense Reimbursements likely would impose significant hardship on Employees.

24. On average, the Debtors pay Expense Reimbursements of approximately $10,000 per month in the aggregate. As of the Petition Date, the Debtors estimate they owe approximately $25,000 in outstanding Expense Reimbursements, approximately $20,000 of which will become due within the Interim Period. Although the Debtors ask that reimbursement requests be submitted promptly, sometimes submission delays occur. Accordingly, Employees may submit reimbursement requests for prepetition expenses after the Petition Date. Expense Reimbursements are incurred with the understanding that they will be reimbursed. Without continued reimbursement of the Expense Reimbursements, Employees relying on these benefits would be saddled with additional costs, potentially causing personal financial hardship. Accordingly, to avoid harming Employees who incurred Expense Reimbursements, the Debtors seek authority to satisfy any accrued but unpaid prepetition Expense Reimbursements, solely pursuant to the Final Order, and to continue to pay the Expense Reimbursements in the ordinary course of business on a postpetition basis and consistent with past practice.

**E. Non-Employee Director Compensation.**

25. Debtor Whiting Petroleum Corporation's board of directors consists of eight non-Employee directors (each, a "Director"). The Directors receive annual cash compensation of between $185,000 to $305,000 for their services as a Director, inclusive of amounts received for

their service on any committees. Directors are generally prepaid annually and also are entitled to expense reimbursement for reasonable out-of-pocket expenses in connection with travel related to their Director duties (the "Director Compensation").

26. The Debtors do not believe they presently owe any prepetition amounts on account of the Director Compensation. As such, the Debtors seek authority to pay their Directors any Director Compensation in the ordinary course of business and consistent with past practice, and to continue paying Director Compensation to their Directors in the ordinary course of business on a postpetition basis and consistent with past practice.

**F. Non-Insider Severance Program (Final Order Only).**

27. In the ordinary course of business, the Debtors provide severance benefits to certain non-Insider, rank-and-file Employees[4] in the event of a termination by the Debtors that is not for "cause," by reason of death or disability, or if the Employee voluntarily resigns (the "Non-Insider Severance Program"). All non-Insider Employees are eligible for the Non-Insider Severance Program. Under the Non-Insider Severance Program, Employees receive, following termination and upon signing a severance agreement, a payment determined by a combination of the Employee's salary and length of time employed by the Debtors.

28. The Debtors believe that the Non-Insider Severance Program is critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation, generate growth, and position themselves for long-term success. Furthermore, as a condition to receiving

---

4 The relief sought under this motion with respect to the Non-Insider Severance Program does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors may seek separate authority with respect to such parties, to the extent necessary, and reserve all rights with respect to the "insider" status of such parties.

benefits under the Non-Insider Severance Program, the Debtors typically require that each Employee execute a release agreement, whereby the participating Employee releases any claims held against the Debtors.

29. As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid obligations on account of the Non-Insider Severance Program. However, for the avoidance of doubt, the Debtors seek authority to continue to honor the Non-Insider Severance Program in the ordinary course of business on a postpetition basis and consistent with past practice.

**II. Employee Benefit Programs.**

**A. Health and Welfare Programs.**

30. The Debtors offer a comprehensive employee benefits package to all of their full-time Employees for medical, dental, and vision care coverage and certain other benefits (collectively, the "Health and Welfare Programs"), including:

- health care coverage;
- life insurance;
- disability benefits;
- workers' compensation; and
- the 401(k) Plan (as defined herein).

31. Accordingly, the Debtors seek authority to pay any unpaid prepetition amounts due under the Health and Welfare Programs and to continue the Health and Welfare Programs in the ordinary course of business on a postpetition basis and consistent with prepetition practices.

**1. Health Insurance Programs.**

32. The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including the Medical Plan, Dental Plan, and Vision Plan (each as defined below, and collectively, the "Health Insurance Programs"). Employees that work an average of at

least 30 hours per week become eligible for the Health Insurance Programs after one month of continuous employment. The Debtors make monthly payments on account of each of the Health Insurance Programs either before or at the start of the coverage period.

33. The Debtors offer a partially self-insured PPO medical and prescription drug plan (collectively, the "Medical Plan") to Employees, which is provided by Meritain Health, an Aetna company. The Medical Plan offers a network of healthcare providers known as the Aetna Choice POS II Network. While Employees are free to choose their own healthcare providers, they generally obtain lower rates from "in-network" providers than from "out-of-network" providers. Generally, the medical and prescription drug coverage provided under the Medical Plan depends on a variety of factors, including, but not limited to, whether the coverage is sought for an individual or a family, or whether treatment is sought "in-network" or "out-of-network." Thus, monthly health care premiums per Employee may vary depending on the specific coverage under the Medical Plan in which the Employee is enrolled and whether the Employee has dependents also covered by the applicable plan. Prescription coverage is provided to all Employees who enroll in the Medical Plan, although Employee out-of-pocket costs may vary depending on whether prescriptions are fulfilled through "in-network" or "out-of-network" providers. As of the Petition Date, the Debtors estimate that there are approximately $200,000 in outstanding obligations on account of the Medical Plan.

34. The Debtors also provide Employees with self-insured dental insurance (the "Dental Plan") through Meritain Health. There is no network of providers associated with the Dental Plan, and Employees are free to choose any provider they wish. As of the Petition Date, the Debtors do not believe they have any outstanding obligations on account of the Dental Plan.

35. The Debtors also provide Employees with self-insured vision insurance (the "Vision Plan") through VSP Vision Care. The Vision Plan covers, among other things, eye exams and prescription glasses, and provides discounts for related products. Extent of coverage provided by the Vision Plan depends on a variety of factors, including whether Employees choose a provider within the VSP network. As of the Petition Date, the Debtors estimate that there are approximately $15,000 in outstanding obligations on account of the Vision Plan, all of which will be due and owing within the Interim Period.

**2. Insurance, Disability, and Workers' Compensation Programs.**

**a. Life and AD&D Insurance Programs.**

36. The Debtors provide self-insured life and accidental death and dismemberment insurance coverage (the "Life and AD&D Insurance") to Employees through The Hartford, which provides maximum coverage of up to 200 percent of the applicable Employee's annual salary in the event of an Employee's death or injury, up to a maximum of $700,000. Life and AD&D Insurance coverage amounts decrease incrementally when an Employee reaches the age of 65, 70, and 75. Employees have the option to enroll themselves, their spouses, and their dependents in supplemental Life and AD&D Insurance at their own expense. The Debtors make monthly payments on account of the Life and AD&D Insurance in the month following the covered period. As of the Petition Date, the Debtors estimate that they owe approximately $27,000 in outstanding obligations on account of the Life and AD&D Insurance.

**b. Disability Benefits.**

37. The Debtors also provide self-insured disability benefits for both short-term disability and long-term disability, (respectively, the "Short-Term Disability Benefits and "Long-Term Disability Benefits" and together, the "Disability Benefits"). The Short-Term Disability Benefits provide a maximum benefit period of thirteen weeks, with a weekly benefit of

60 percent of basic weekly compensation, up to a maximum of $2,500. An Employee receiving Short-Term Disability Benefits can become eligible for Long-Term Disability Benefits after 90 days if he or she is still deemed disabled. Under the Long-Term Disability Benefits, Employees receive a monthly benefit of 60 percent of their monthly pre-disability earnings, up to a maximum of $10,000. The length of the benefits period for the Long-Term Disability Benefits depends on factors such as the Employee's Social Security normal retirement age, and his or her age when the disability began. The Debtors make monthly payments on account of the Disability Benefits in the month following the covered period. As of the Petition Date, the Debtors do not believe there are any outstanding obligations on account of the Short-Term Disability Benefits, but estimate that there are approximately $14,500 in outstanding obligations on account of the Long-Term Disability Benefits.

**c. Workers' Compensation Program.**

38. The Debtors maintain workers' compensation insurance for Employees at the levels required by law in the states in which the Debtors operate (collectively, the "Workers' Compensation Program"). All Employees are entitled to participate in the Workers' Compensation Program. Currently, the Debtors maintain coverage under the Workers' Compensation Program in North Dakota through North Dakota Workforce Safety and Insurance, and, for all other states in which the Debtors operate, through Liberty Mutual.

39. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these chapter 11

cases.[5] There are currently two open claims under the Workers' Compensation Program to which this would apply. To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

40. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process. The annual cost of the Workers' Compensation Program is approximately $750,000. As of the Petition Date, the Debtors estimate that approximately $550,000 of obligations are currently accrued and outstanding on account of the Workers' Compensation Program. Out of an abundance of caution, the Debtors seek authority to pay any unpaid amounts on account of the Workers' Compensation Program, to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, and to modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable.

**3. 401(k) Plan.**

41. The Debtors provide all Employees who work an average of at least 30 hours per week and are over the age of 21 with the ability to participate in a 401(k) defined contribution program (the "401(k) Plan"). The 401(k) Plan currently is administered by Wells Fargo as the

5 The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

plan trustee, and all administrative costs associated with the 401(k) Plan are deducted from the assets contributed by the Employee. The 401(k) Plan allows Employees to make both pre-tax and Roth contributions in amounts up to the maximum amount allowed by the IRS. Each Employee's contributions under the 401(k) Plan are automatically deducted from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "<u>401(k) Deductions</u>"). As of the Petition Date, the Debtors estimate that they are obligated to remit approximately $200,000 on account of the 401(k) Deductions.

42. In addition, the Debtors match the Employees' annual 401(k) Plan contributions on a discretionary, dollar-for-dollar basis up to either eight percent of the Employees' annual compensation, or up to the maximum amount allowed by the IRS (collectively, the "<u>401(k) Contributions</u>"). The Debtors pay the 401(k) Contributions on an ongoing basis with each payroll period. At the end of each calendar year, the Debtors conduct a true-up of their 401(k) Contributions. The Debtors expect to contribute a total of approximately $4.5 million in 2020 on account of the 401(k) Contributions. As of the Petition Date, the Debtors estimate that there are approximately $150,000 related to the 401(k) Contributions that are accrued and outstanding.

43. Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contributions. As such, the Debtors believe that continuing the 401(k) Plan and the 401(k) Contributions is essential to maintaining Employee morale and protecting Employee expectations. In addition, the Debtors believe that the 401(k) Deductions generally are held in trust by the Debtors and are not property of their estates. Accordingly, the Debtors seek authority to pay any 401(k) Contributions in the ordinary course of business and consistent with past practice, and to continue paying 401(k)

Contributions in the ordinary course of business on a postpetition basis and consistent with past practice.

**B. Paid Leave.**

44. The Debtors maintain several paid leave benefit programs for Employees, providing paid leave for circumstances including annual vacation allotment, sick leave, and inclement weather (together, the "Paid Leave"). Accrued but unused Paid Leave is paid out to Employees upon termination only with respect to vacation. Similar to other programs described in the Motion, Paid Leave is an integral benefit that the Debtors offer to the Employees, and will help maintain Employee morale and protect Employee expectations.

45. As of the Petition Date, the Debtors estimate that there are approximately $11.8 million in Paid Leave obligations outstanding, none of which will be due and owing in the Interim Period. Accordingly, the Debtors seek authority to pay their Employees any Paid Leave in the ordinary course of business and consistent with past practice, and to continue paying Paid Leave to their Employees in the ordinary course of business on a postpetition basis and consistent with past practice.

**III. Supplemental Employee Benefits (Final Order Only).**

**A. Wellness Reimbursement.**

46. The Debtors provide reimbursement for certain health-related personal expenses (the "Wellness Reimbursement"). Employees report various personal expenses pertaining to health and wellness, and eligible expenses are reimbursed by the Debtors in the fourth quarter of every calendar year, up to a maximum of $600 per Employee. The average annual cost of this program is approximately $300,000. As of the Petition Date, the Debtors believe that there are approximately $75,000 of accrued and unpaid obligations under the Wellness Reimbursement program, none of which will become due in the Interim Period. The Debtors seek authority to

continue to honor the Wellness Reimbursement program in the ordinary course of business on a postpetition basis and consistent with past practice.

**B. Parking Program.**

47. The Debtors also have a program in place to cover the cost of parking for Employees located in Denver (the "Parking Program"). The monthly cost of coverage per person ranges from $230 to $355. Currently, approximately 180 Employees participate in the Parking Program. The average monthly cost of the Parking Program is approximately $50,000, and becomes payable on the 15th of every month prior to the billing period. As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid obligations under the Parking Program. Accordingly, the Debtors seek authority to continue to honor the Parking Program in the ordinary course of business on a postpetition basis and consistent with past practice.

**C. EcoPass.**

48. The Debtors also cover the costs of the EcoPass to their Employees located in Denver, Colorado (the "EcoPass Program"). The EcoPass is an employer-sponsored pass providing Employees with unlimited access to buses and trains in the city of Denver. All Denver-located Employees are eligible for an EcoPass. Currently, the Debtors provide EcoPasses to 223 Employees. The passes for the EcoPass program are paid for at the start of each calendar year and the typical aggregate annual cost to the Debtors is approximately $113,000. As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid obligations on account of the EcoPass Program. Accordingly, the Debtors seek authority to continue to honor the EcoPass Program in the ordinary course of business on a postpetition basis and consistent with past practice.

**D. Clean Air Stipend.**

49. The Debtors also offer a stipend (the "Clean Air Stipend") to those Employees located in Denver who wish to forgo the Parking Program. The Debtors pay a momthly stipend of $100 to Employees who are eligible for the Parking Program but elect to not use it. The stipend is paid twice monthly in $50 installments. 57 Employees currently receive the Clean Air Stipend. As of the Petition Date, the Debtors estimate that there are approximately $2,850 in accrued and unpaid obligations on account of the Clean Air Stipend, all of which will become payable within the Interim Period. Accordingly, the Debtors seek authority to continue to honor the EcoPass Program in the ordinary course of business on a postpetition basis and consistent with past practice.

**E. Financial Counseling Program.**

50. The Debtors also offer financial advising services to certain Employees (the "Financial Counseling Program") provided by Ayco, a firm specializing in employer-sponsored financial counseling. As of the Petition Date, six Employees participate in the Financial Counseling Program. The Debtors spend approximately $72,000 per year on the Financial Counseling Program. As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid obligations on account of the Financial Counseling Program. Accordingly, the Debtors seek authority to continue to honor the Financial Counseling Program in the ordinary course of business on a postpetition basis and consistent with past practice.

## Basis for Relief

**I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.**

**A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.**

51. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority

claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for: (a) wages, salaries, or commissions, including sick leave pay earned by an individual; and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").

### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

52. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d); *see also In re Equalnet Commc'ns*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *In re Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

53. Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority.

26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

54. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code.

55. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. at 369–70 (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In doing so, these courts acknowledge that several legal

theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

56. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. at 497). Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a); *In re CoServ*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims); *In re CEI Roofing, Inc.*, 315 B.R. at 60 (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)" the court's job is easier when it considers approval of such prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business). The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy]

Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

57. Payment of Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees and Independent Contractors exclusively rely on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees and Independent Contractors will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

58. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees and Independent Contractors, the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases. The oil and gas industry is a highly specialized business that requires unique technical expertise. The Debtors believe that without these payments, their workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees and Independent Contractors may face. Such individuals may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits

is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice on a final basis from the outset of these cases.

## III. A Limited Waiver of the Automatic Stay for the Workers' Compensation Program Is Appropriate in this Case.

59. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

60. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employees' workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of

the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

**Cause Exists to Authorize the Debtors'**
**Financial Institutions to Honor Checks and Electronic Fund Transfers**

61. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**Emergency Consideration**

62. Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion. The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the "immediate and

irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

63. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

64. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the

Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

65. The Debtors will provide notice of this motion to the following parties or their counsel: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition revolving credit facility; (d) the lenders under the Debtors' prepetition revolving credit facility; (e) the indenture trustee for the Debtors' unsecured notes; (f) the ad hoc group of senior noteholders; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (k) the state attorneys general for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim and Final Orders, granting the relief requested in this motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
April 1, 2020

Respectfully Submitted,

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
jwertz@jw.com
vpolnick@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
Anna Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: brian.schartz@kirkland.com
anna.rotman@kirkland.com

-and-

Gregory F. Pesce (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: gregory.pesce@kirkland.com

-and-

Stephen Hessler, P.C. (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: stephen.hessler@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on April 1, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh